FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2006 SEP 26  AM 9: 30

GREGORY C. LANGHAM
CLERK

BY_____DEP. CLK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____ **06- CV - 01912**

**JOHN TONEY** and
**VALERIE TONEY**

      Plaintiffs, Pro Se

vs.

**GMAC MORTGAGE CORPORATION**, a Pennsylvania Corporation

      Defendant.

---

## COMPLAINT

Plaintiffs, appearing Pro Se, state as follows:

### NATURE OF ACTION

1. Plaintiffs bring this action against GMAC Mortgage Corporation ("GMAC" or the "Company") to enjoin GMAC from engaging in misleading and wrongful conduct in connection with the servicing of Plaintiffs' residential mortgage loan and to recover damages caused to Plaintiffs by the Company's unlawful conduct in connection with the servicing of their residential mortgage loan.

2.  GMAC has engaged in unlawful, unfair and deceptive business practices in its "servicing" of Plaintiffs' residential mortgage loan.  As used herein, servicing refers to the right to collect monthly interest and principal payments, taxes and insurance on a mortgage loan.

3.  The Company's unlawful and deceptive practices in the servicing of Plaintiffs' residential mortgage loan include, but are not limited to:  (a) imposing unwarranted and improper fees; (b) intentionally or recklessly failing to acknowledge receipt of payments and/or failing to credit timely payments; (c) failing to respond to and/or acknowledge receipt of numerous Qualified Written Requests; (d) improperly running disputed amounts delinquent; (e) improperly reporting disputed amounts as delinquent to credit bureaus; (f) failing to notify credit bureaus that the account information was being disputed; (g) improperly referring accounts to Company's collections and foreclosure departments; and (h) instituting improper foreclosure proceedings, without giving Notice of Default or a Right to Cure, pursuant to their Deed of Trust.  As a result of the foregoing practices, GMAC recklessly caused Plaintiffs to fall behind in their monthly payments, and as a result, subjected them to unwarranted fees and foreclosure action and inflicted serious pecuniary harm, ruining Plaintiffs' joint credit history, and eventually forcing them into bankruptcy.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 1367, 12 U.S.C. § 2614, and 15 U.S.C. § 1681p.

5.  Venue is proper in the District Court for the District of Colorado pursuant to 28 U.S.C. §§ 139 (b) and (c).

## THE PARTIES

6.  Plaintiffs, Pro Se, John and Valerie Toney ("Mr. and Mrs. Toney") are residents of the State of Colorado.

7.  GMAC is one of the nation's largest residential mortgage lenders and servicers, with more than two million customers throughout the United States.  GMAC is a wholly owned subsidiary of General Motors Acceptance Corporation, one of the largest financial services companies in the world.  GMAC originates first and second lien residential mortgage loans through a nationwide network of retail offices, direct lending centers and internet sites under the brands gmacmortgage.com and ditech.com.

8.  GMAC has offices in various states throughout the United States, including its headquarters located at 100 Witmer Road, Horsham, Pennsylvania 19044.

The Company also has an office located at 500 Enterprise Road, Suite 150, Horsham, Pennsylvania 19044, and is qualified to do business in Colorado.

## GENERAL ALLEGATIONS

9.   GMAC is one of the nation's largest residential mortgage lenders and servicers.  GMAC publicly touts its cooperative and consumer-friendly operations.  The Company's website (gmac.com) states:  "Our friendly, familiar face may be the answer to all your home financing needs.  When you become our customer, you are joining the larger GM family and can benefit from a variety of services and products.  GMAC is more than just a mortgage company it's a homeownership company.  The company has maintained a vision of being the best at helping customers realize their homeownership dreams."

10.   Contrary to its representations, when GMAC serviced Plaintiffs' loan, it breached their loan agreement and violated numerous laws by, among other things failing to credit payments timely, charging improper fees, improperly foreclosing, failing to acknowledge and/or respond to Qualified Written Requests, and improperly reporting disputed amounts to credit reporting agencies.  GMAC's deceptive, improper, fraudulent and unfair servicing resulted in the assessment of unwarranted fees and the initiation of wrongful default and foreclosure proceedings against Plaintiffs.

11. Plaintiffs are the owners of property located at 7126 South Birch Way, Centennial Colorado, 80122.

12. Plaintiffs took out a second mortgage on such property on April 5, 2001, with Genisys Financial Corporation in the amount of $50,000, the servicing of which apparently was simultaneously assigned, sold or transferred to GMAC. [Exhibit 1] Plaintiffs have engaged in actively disputing the servicing of their second mortgage with GMAC since February 2003.

13. Despite many letters Plaintiffs sent by both fax and mail, disputing the servicing, and/or receipt of payments on their account, GMAC ran the account delinquent, reported it as such to all credit bureaus and eventually placed it in default status. Plaintiffs received no written response, specific to their disputes, from GMAC from February 2003 through September 2003, despite the fact that they were disputing their account in writing and citing their rights to a written response from GMAC.

14. In complete disregard of the Deed of Trust, GMAC declared the account to be in default and accelerated the loan without Notice to Plaintiffs. Events relevant to the illegal foreclosure procedure are as follows:

(a.) September 17, 2003-- Mrs. Toney received 2 phone calls from Sam Howell, an internal collector for GMAC in Horsham, Pennsylvania.

At this time, Mr. Howell verbally informed Mrs. Toney that the "file" (Plaintiffs' account) was on his desk, heading to foreclosure.  Mrs. Toney told him that she disputed her loan being delinquent because she'd been disputing the servicing of the account and/or receipt of payments for many months.  Mr. Howell told her that she had "…no rights…and your disputes are now moot because you're in foreclosure."  Mr. Howell told her that he would look into how much she would have to pay in attorneys fees, and said he would call her later in the week to discuss it further.

(b.)  September 22, 2003-- Sam Howell left message on the Toneys' voicemail, asking for a return call.  Mrs. Toney returned the call shortly thereafter.  Mr. Howell informed Mrs. Toney that he never showed any dispute letters and/or receipt of payment issues on the account.  He also informed Mrs. Toney that there was now $1,969 in attorneys' fees added on to the account.  Mrs. Toney strongly disputed everything she was being told, based on the fact the Toneys had never received anything from GMAC in writing (responses to her dispute letters or Notice of Default).  Mr. Howell completely disregarded Mrs. Toney's verbal dispute of the loan being in default.  He told her that he would take the total amount (the amount due to bring the account current plus the attorneys' fees) and divide it up into 2 payments of $2974.50 each; with the first payment being due in October and the second in November.  Mr. Howell stated that if Mrs. Toney agreed to that, he would then reinstate the loan.  He also informed her

that he would not stop the foreclosure proceedings unless she agreed to pay all amounts due, including the attorneys' fees. Mrs. Toney told him she would have to discuss it with her husband; Mr. Howell agreed and told her that he would "...put it on Hold Status and call you by the end of the week to discuss your decision."

Mrs. Toney subsequently read through her Loan Agreement and Deed of Trust; and though knowing that GMAC had failed to honor the contract by not giving Notice of Default or a 20 day Right to Cure, the Toneys decided to borrow money from Mr. Toney's 401K plan to cure the disputed default on their home to save their home from an unwarranted foreclosure.

(c.) September 23, 2003--Mr. Toney applied for the 401K loan. [Exhibit 2]

(d.) September 24, 2003—Contrary to Mr. Howell's representation, Plaintiffs received a letter dated September 22, 2003, entitled "Notice Under the Fair Debt Collection Practices Act" from Castle, Meinhold & Stawiarski, LIC; (Defendant's attorneys) indicating that he law firm had been retained by GMAC to initiate foreclosure proceedings, demanding payment, including attorneys' fees, in the amount of $52, 009.23. The Notice identified the law firm as a debt collector. The Notice did not comply with the Notice or Right to Cure pursuant to

the Acceleration Clause in the Deed of Trust governing the Toneys' loan, though it did specify their right to dispute the content in the collection letter.  [Exhibit 3]

(e.)  Also on <u>September 24, 2003</u>—Mrs. Toney called Mr. Howell in response to the letter from Castle, Meinhold & Stawiarski.  Mrs. Toney read to Mr. Howell from the Deed of Trust, which clearly indicated that there must a written Notice of Default and 20 Day Right to Cure, which were never sent to the Plaintiffs.  Mr. Howell told Mrs. Toney that GMAC "didn't have to do anything in writing...we can call or do whatever we want to do."  When Mrs. Toney told Mr. Howell that she would not pay the attorneys' fees he was demanding, Mr. Howell became furious.  He stated, "You're going to lose your home...yes you are...it might take us 5 months, but we'll get it...oh yeah, we'll get it."  Trying to remain calm because her youngest daughter was on her lap, Mrs. Toney again informed Mr. Howell that she would pay the amount that GMAC claimed was due to bring the account current (even though some of the amounts had previously been disputed by the Toneys through written correspondence to GMAC), but she would not pay the attorneys' fees.  Mr. Howell abruptly began to yell, "That's it! I'm taking this off of Hold Status---you're going to lose your home!"  When Mrs. Toney began to speak, Mr. Howell yelled, "This conversation is over!!" and terminated the phone call without answering any of the Plaintiff's complaints or questions.

(f.) September 29, 2003—Using borrowed funds from Mr. Toney's 401k account, Plaintiffs sent a Cashier's Check in the amount of $3800 to GMAC in Horsham, Pennsylvania.  The check was sent to the attention of Sam Howell along with a handwritten note asking for a phone call to verify that the funds were received and applied, asking for the excess amount to be applied as a partial payment, and pointing out the bank stamp on the check stipulating that a member must post a bond and indemnify the credit union in the event that the check is lost, misplaced or stolen.  FedEx receipt information shows that the package was received at 9:35 a.m (ET). on September 30, 2003.  [Exhibit 4]

(g.) Also on September 29, 2003—Plaintiffs wrote (by Certified Mail) to Castle, Meinhold & Stawiarski, LLC, informing them that Plaintiffs had been actively disputing the servicing of their account and/or amounts GMAC claimed were due, that they had been disputing everything in writing for months, that GMAC had never responded to their disputes, and that the amount which the attorneys claimed was due and owing was in error.  The Plaintiffs also sent copies of all Qualified Written Requests as of that date to Castle, Meinhold & Stawiarski.  The USPS delivery confirmation shows that the letter was received on September 30, 2003.  [Exhibit 5]

(h.) In or about September 2003—GMAC reported a Charge Off in the amount of $48, 594 to all credit bureaus.  The Toneys were not aware of the

Charge Off  until over a week later.  GMAC told the Plaintiffs it would remove the

Charge Off, but GMAC later verified its accuracy to a credit bureau, and it

remained on Mr. Toney's credit report until at least June 2004.  [Exhibit 6]


(i.) October 1, 2003—Plaintiffs received by Certified Mail a "Notice of

Election and Demand for Sale by Public Trustee", seeking to force a sale of

Plaintiffs' home.  Within this Notice, GMAC attorneys, Castle, Meinhold &

Stawiarski, LLC, acting on behalf of GMAC, "declares a violation of the

covenants of said Deed of Trust, declares the whole indebtedness due and

payable pursuant to the acceleration clause contained in said Deed of Trust..."

This Notice was sent despite the fact that no Notice of Default or 20 Day Right to

Cure, as required by the same acceleration clause cited by the Defendant, was

ever sent to Plaintiffs; and after which any default (which was caused by GMAC's

erroneous conduct in the first instance) was cured.  (Emphasis added) [Exhibit 7]


(j.) Also on October 1, 2003—Immediately after receiving this Notice, Mrs.

Toney called GMAC.  Upon entering her account number, she was transferred to

Tom Scollin in GMAC's Recovery Center, located in Shelton, Connecticut.  Mrs.

Toney briefly informed him of the prior events, and wanted answers about why

the foreclosure hadn't been stopped.  Mr. Scollin told her he would call her in the

morning, as it was 5:30 in his time zone, and he was just leaving for the day.

(k.) <u>October 2, 2003</u>—Mrs. Toney spoke twice with Mr. Scollin, at which

time he was inquiring about the whereabouts of the $3800 Cashier's Check

(subsequently found on Mr. Howell's desk), and to see if the foreclosure

proceedings had been stopped.  Mrs. Toney wrote a Qualified Written Request

dated October 1, 2003, but was discouraged by Mr. Scollin from sending it,

because "it will just end up on my desk, anyway."  She later sent the letter, and

all previously letters to his attention, at the request of Mr. Scollin's supervisor.

[Exhibit 12]


(l.) <u>October 4, 2003</u>—Plaintiffs received a letter from the County of

Arapahoe notifying them of their Right to Cure, but <u>never</u> received such a letter

from GMAC.  The Right to Cure from the County stated the Borrower's rights

under Colorado law generically, but was not specific to Plaintiffs' Deed of Trust

with GMAC.  [Exhibit 8]


(m.) <u>October 6, 2003</u>—Mrs. Toney spoke with Tom Scollin and was told

by Mr. Scollin that he had spoken to his supervisor, Joe Carravetta, about her.

He told Mr. Carravetta that "…This lady has all of her ducks in a row…" and said

he would have Mr. Carravetta call her.


(n.) October 7, 2003—Mrs. Toney spoke with Mr. Carravetta and was

advised that Plaintiffs' file had been assigned to Mr. Scollin.  Mr. Carravetta

further advised Mrs. Toney to re-send all of her previous dispute letters to Mr. Scollin's attention, which she did, so that they would "...be made a part of your permanent file."

(o.) October 7, 2003—Plaintiffs received a letter (dated October 6, 2003) and accompanying paperwork from Castle, Meinhold & Stawiarski, LLC, on behalf of defendant, notifying them of a November 3, 2003, hearing date in the Arapahoe County Court. The enclosed Notice of Hearing stated as follows:

> GMAC MORTGAGE CORPORATION, Applicant herein, has filed a Motion with the Court, claiming to be the owner of a Deed of Trust to the Public Trustee of the County of ARAPAHOE, State Of Colorado in the original amount of $50,000.00. The Motion Claims that said Applicant has the right to foreclose the Deed of Trust because the maker of said Note or his successors and Assigns has failed to make payment according to its terms and said Note is presently in default. The Motion requests a court Order authorizing the Public Trustee to sell [description of Plaintiffs' property}    (Emphasis added)  [Exhibit 9]

(p.) While the Notice of Election and Demand for Sale was subsequently withdrawn on October 9, 2003, Defendant Castle, Meinhold & Stawiarski made

representations to Plaintiffs that, "nothing was filed with the Arapahoe District Court in this matter," and attempted to cover those representations by claiming instead that "the foreclosure package was hand-delivered to the Arapahoe County Public Trustee on September 30, 2003." Because these appeared to the Plaintiffs to be real court papers, Mrs. Toney (who was very upset at the thought that their home was going to be sold), called Mr. Scollin and left a message on his voicemail immediately after reading the letter.

(q.) October 8, 2003—Mrs. Toney received a phone call from an individual named "Nick", a trainee of Mr. Scollin. Nick verbally informed Mrs. Toney that the account had been charged off. Mrs. Toney told Nick that she had been told that Mr. Scollin was the only one who would be handling her account, and Nick subsequently transferred her to Mr. Scollin. Mr. Scollin indicated that he would look into what kind of notice Plaintiffs would be getting regarding stopping the foreclosure proceeding. He also stated that he understood how horrible this situation was for Plaintiffs and that he had never seen anything "this bad in all my time here...but just trust me, okay?"

(r.) October 9, 2003—Mr. Scollin left a message for Plaintiffs that the attorneys should stop all foreclosure action, because "the foreclosure was stopped." Later that same day, Mrs. Toney left a message for Mr. Scollin regarding four letters Plaintiffs had received in the mail from companies wanting

to save their home.  She was very humiliated about their situation being a matter of public record and upset about the fact that the foreclosure action did not appear to have been stopped, as he had indicated.

(s.) <u>October 10, 2003</u>—Unknown individuals showed up at Plaintiffs' door to help with foreclosure.  These individuals confirmed that paperwork had been filed with the County on October 3, 203.  Plaintiffs received additional letters in the mail offering foreclosure help.

(t.) Also on <u>October 10, 2003</u>—Mrs. Toney had a conversation with Mr. Scollin wherein he admitted that Sam Howell had overstepped his boundaries by sending the loan to foreclosure.  He said that he was quite confident that Mr. Howell never even saw Plaintiffs' loan agreement, that Mr. Howell was on a "power trip", and that he has heard other horror stories about him.  Mr. Scollin commented that "the people in Pennsylvania do everything . . . backwards, but here (referring to Connecticut) we take pride in our work."  Mr. Scollin told Mrs. Toney that the foreclosure had been stopped before the October 6, 2003 letter from Castle, Meinhold & Stawiarski, and that while the $3,800 Cashier's Check was finally applied, it was not applied when it was received on September 30, 2003, but was applied days later.  After her conversation with Mr. Scollin, Mrs. Toney called Castle, Meinhold & Stawiarski to confirm that in fact the foreclosure action had been stopped, but never received a response.

(u.)  On or about <u>October 11, 2003</u>—Someone dropped off a letter in

Plaintiffs' mailbox wanting to save their house from foreclosure, and they also

received a letter with bold letters on the outside of the envelope stating;

"FORECLOSURE HELP".  To add to the embarrassment, Plaintiffs personally

knew their postal carrier and the personnel at their post office.

(v.)  <u>October 13, 2003</u>—Plaintiffs sent a letter via Certified Mail to Castle,

Meinhold & Stawiarski, LLC, outlining their many disputes regarding the

foreclosure proceedings, including the fact that they never received a Notice of

Default or Right to Cure.  Plaintiffs also inquired as to the papers the firm, on

behalf of GMAC, had filed with the Arapahoe County Court.  [Exhibit 10]

(w.)  <u>October 15, 2003</u>—Plaintiffs received a reply from the firm enclosing

a copy of a Withdrawal of Notice and Election and Demand.  In the same letter,

the firm denied filing papers with the County.  [Exhibit 11]

(x.)  <u>October 17, 2003</u>—By letter addressed and sent to Tom Scollin in

the GMAC Connecticut Recovery Center, Plaintiffs re-sent all correspondence

previously sent to GMAC, including the October 1, 2003, Qualified Written

Request that Mr. Scollin discouraged Mrs. Toney from sending to GMAC's

corporate address in Pennsylvania.  The documents, along with a detailed cover

letter were received on October 20, 2003. Mrs. Toney continually disputed (both verbally and in writing) any and all attorneys' fees that were improperly assessed to her account. When Mrs. Toney called Mr. Scollin on October 21, 2003 to verify that he had received the documents, he commented, "Yeah, it took me nearly an hour to read all of them." This contradicts the representations made by GMAC to the Colorado State Attorney General to Plaintiffs themselves when it said that it had "no record" of Plaintiffs' dispute. [Exhibit 12]

(y.) November 5, 2003--Nick, Mr. Scollin's trainee, called Mrs. Toney and fully admitted the company's negligent handling of Plaintiffs' account. He said that he would obtain a letter stating that Plaintiffs' loan was never delinquent and that he would remove the Charge Off and foreclosure information from Plaintiffs' account. Nick told Mrs. Toney about another GMAC customer who was in a similar situation due to Sam Howell's conduct and commented that he has "only worked for GMAC for 2 months, but heard lots of complaints about Sam Howell...doing the same kind of stuff to other people...leaving really mean messages and being verbally abusive to people."

(z.) November 6, 2003—Mr. Scollin called Mrs. Toney, enraged that she had spoken to Nick, despite the fact that Nick had called the Plaintiff to discuss the account. After yelling at Mrs. Toney, he stated that he would remove the Charge Off from Plaintiffs' account, and would get her verification of the same.

Despite this statement, the Charge Off remained on Mr. Toney's credit report until at least June 2004.

(aa.)  Mrs. Toney reminded Mr. Scollin that she was still not receiving any account statements from GMAC.  Mr. Scollin condescendingly told Mrs. Toney that he was "…not the statement fairy…I can't just make them appear."  He then threatened to return the account to Sam Howell for handling collection, if Mrs. Toney did not pay the monthly bill to Mr. Scollin, despite the Plaintiffs not being sent statements and having no knowledge of how recent payments were being applied and/or what additional fees were currently on their account.

(bb.)  Frustrated by GMAC's complete failure to rectify their situation, Plaintiffs prepared a letter to the Office of the Attorney General of the State of Colorado dated November 8, 2003, which detailed their disputes with GMAC and the Company's illegal practices.  Plaintiffs contacted the Colorado Office of the Attorney General and orally informed them of the dispute at that time, but were advised not to send the letter at that time.

(cc.)  December 1, 2003—Plaintiffs sent a payment to the Company's Pennsylvania address, which was received and signed for on December 2, 2003. By letter dated December 15, 2003, Mr. Scollin formally notified Plaintiffs that

their account had been transferred to the Recovery Department in Shelton, Connecticut.

(dd.) December 18, 2003—Plaintiffs received a letter (dated December 11, 2003), which returned the last check sent to GMAC, because the "written and numeric amounts were different".  Plaintiffs were advised to either correct the check or issue a new one and send it to a Phoenix, Arizona address.  Mrs. Toney called Mr. Scollin that day at which time he indicated that there was "nothing in the notes" about having received a payment in December from Plaintiffs.  He told Mrs. Toney to send the payment to him and he would take care of it.  [Exhibit 13]

(ee.) December 18, 2003—Plaintiffs sent two more Qualified Written Requests to GMAC, one disputing the handling of the payment sent in December, the other disputing fees on Plaintiffs' account.  [Exhibit 14]

(ff.) December 19, 2003—Plaintiffs forwarded the two above-referenced Qualified Written Requests to Mr. Scollin, along with the check (the same check which had been returned on December 18), which were received on December 22, 2003.  On December 29, 2003, the check cleared Plaintiffs' credit union checking account with no problems, and the credit union confirmed to Mrs. Toney that there was "nothing wrong with the way you wrote your check out."

(gg.) Additional fees were assessed in December 2003 when GMAC returned Plaintiffs' payment, after holding on to it for 11 days because the written and numeric amounts were different. Despite the fact that this check was written as prior checks had been, the Company arbitrarily deemed the check improper, thus attempting to collect additional and improper fees.

(hh.) March 24, 2004—Plaintiffs sent GMAC a Notice to Cease and Desist in its unfair and illegal servicing of Plaintiffs' loan which, again, outlined their many disputes with the Company and which was received by GMAC on March 29, 2004. [Exhibit 15]

(ii.) March 29, 2004—Plaintiffs sent Notice of Proposed Settlement to GMAC, because it was becoming too difficult to solely mitigate the damages from the Charge Off on Mr. Toney's credit report. This Notice was sent to both GMAC addresses (Pennsylvania and Connecticut) and was received at both locations on April 1, 2004. [Exhibit 16]

(jj.) April 28, 2004—Plaintiffs have an oral conversation with the Office of the Attorney General State of Colorado ("Attorney General"), wherein Plaintiffs were requested to file a complaint against GMAC with the Attorney General's Office, including all written correspondence to and from GMAC to date.

The complaint was hand delivered to the Attorney General's Office the following day.  [Exhibit 17]


(kk.)  May 1, 2004—Plaintiffs sent another Qualified Written Request (dated April 26, 2004) to GMAC summarizing all of Plaintiffs' disputes and reaffirming their Cease and Desist.  The Qualified Written Request was received on May 3, 2004.  [Exhibit 18]


(ll.)  Plaintiffs receive their first ever response (from James Panero, a legal representative for GMAC) to their many Qualified Written Requests by letter dated May 7, 2004.  The response merely indicated that the Company was investigating the statements in Plaintiffs' April 26, 2004 letter and would respond as soon as possible.  [Exhibit 19]   Plaintiffs sent a letter by fax to Mr. Panero on May 27, 2004, notifying GMAC that Plaintiffs would be escrowing further payments until either GMAC resolved all of the Plaintiffs' complaints, or the matter came before a judge.  GMAC ceased all collection efforts, no longer sending monthly statements to Plaintiffs.  [Exhibit 20]


(mm.)  June 23, 2004—Plaintiffs sent GMAC another Qualified Written Request citing their rights under RESPA and asking for a response to their previous letters of dispute.  [Exhibit 21]

(nn.)  Despite all the Qualified Written Requests, each confirmation of receipt, either verbally or as evidenced by mail confirmations, Plaintiffs received a letter dated July 9, 2004 (copied on a letter to the Attorney General) from Kelly Day in the Company's legal department asking for copies of Plaintiffs' previously sent Qualified Written Requests.  By this time, GMAC (or their attorneys Castle, Meinhold & Stawiarski) had received each of Plaintiffs' various letters at least four separate times; when they were originally sent, when they were re-sent to Castle, Meinhold & Stawiarski, when they were resubmitted to Mr. Scollin so as to become "part of [Plaintiffs'] permanent file", and when they were forwarded by the Colorado Attorney General's Office pursuant to its investigation.  [Exhibit 22]

(oo.)  Plaintiffs sent additional Qualified Written Requests on or about July 22, 2004 (dated July 20, 2004), August 17, 2004 (dated August 16, 2004), both with no response from GMAC other than to request that the documents be re-sent.  Plaintiffs also sent another Qualified Written Request on September 22, 2004, and GMAC responded only to the payoff request, giving no acknowledgment to the entirety of the letter.  Said payoff request showed that the account had never been corrected pursuant to many of the letters of disputes Plaintiffs had been writing for months, trying to get GMAC to correct erroneous fees and late charges.  [Exhibits 23, 24, 25, 26 & 27]

(pp.)  In late <u>October, 2004</u>—Mrs Toney had phone conversations with Kelly Day, the Company's legal representative.  Ms. Day continually told Mrs. Toney that she wanted to resolve the complaint issues on the Toneys' account and assured her that GMAC would remedy the situation that was causing such distress to Mrs. Toney.  Ms. Day also informed Mrs. Toney that she would be receiving a call from Kevin Kaveck, the Company's customer service manager.

(qq.)  <u>November 17, 2004</u>—Despite representations made by Ms. Day about resolving the disputes on the Toneys' account, and about having Kevin Kaveck call Mrs. Toney personally to discuss a resolution to all disputes on the account; to add insult to injury, Plaintiffs were notified by an email from Kelly Day that their account was being transferred back to Tom Scollin, the individual who had ignored their complaints for over a year, further evidencing GMAC's policy of non-responsiveness.  [Exhibit 31]

15.  Defendant failed to acknowledge most of Plaintiffs' Qualified Written Requests; and never made the appropriate corrections to the account or provided Plaintiffs the written clarification required under RESPA.

16.  As a result of the Company's failure to respond to Plaintiffs' disputes on the account and subsequent refusal to accept any payments that did not include the

disputed amounts, Plaintiffs were unable to keep their account current and were improperly forced by Defendant into default.

17. In violation of the obligations of GMAC as identified in the Deed of Trust and pursuant to the RESPA, the Company ran Plaintiffs' disputed amount delinquent, and reported them as such to all credit reporting agencies. GMAC made no attempt to resolve the dispute, in many cases failing to provide written acknowledgment within 20 business days of Plaintiffs' numerous Qualified Written Requests, and never made appropriate corrections to Plaintiffs' account within the 60 business days after receiving said Requests.

18. With an unwarranted foreclosure looming, on September 29, 2003, using funds that Plaintiffs borrowed, at considerable cost and potential tax liability to Plaintiffs, Plaintiffs sent a $3,800 Cashier's Check (an amount in excess of that due, including the disputed amount) via Federal Express to GMAC, to the attention of Mr. Howell, to terminate the foreclosure proceedings, although there was still no resolution to Plaintiffs' numerous Qualified Written Requests. This Federal Express delivery was received and signed for by GMAC on September 30, 2003.

19. Despite the fact that payment was received before the grace period had expired, as evidenced by the FedEx receipt, Plaintiffs were assessed an improper late charge. GMAC also applied the excess of that payment to principal, even though

Plaintiffs specifically designated the excess funds to a partial payment.  Further,

because Mr. Howell made no effort to promptly acknowledge receipt of payment, apply

it to the account, and notify GMAC's attorneys (Castle, Meinhold & Stawiarski) that the

loan stood current, the improper foreclosure proceedings continued.  [Exhibit 28]

20.  As a result of GMAC's grossly inadequate and willfully wanton

servicing of Plaintiffs' loan, Plaintiffs were improperly forced into foreclosure.  The

foreclosure proceeding was initiated without adequate Notice of Default or 20 Day Right

to Cure.

21.  In total, Mrs. Toney wrote approximately twenty Qualified Written

Requests from February 2003 to present which were ignored by the Company and Mr.

Scollin, despite continued assurances that GMAC was attempting to resolve Plaintiffs'

complaints.  Incredibly, the first written response to these numerous letters was on May

7, 2004, more than a year after Plaintiffs' first Qualified Written Request, simply

indicating that the Company was investigating Plaintiffs' claims.  The next response,

from attorney Kelly Day, was equally unhelpful and just requested that Plaintiffs, again,

re-send their documents for evaluation.

22.  Plaintiffs re-sent each documentation regarding their disputes with

GMAC at least three separate times, often both faxing and mailing the documents to

two separate GMAC locations.  Plaintiffs' correspondence was sent via Certified Mail,

Federal Express or some other mailing service with delivery confirmation. Despite this, Plaintiffs were given the run-around, asked again and again to re-send documents, and were repeatedly told that GMAC had no record of their dispute. GMAC ignored Plaintiffs' complaints to such an extent that foreclosure proceedings were initiated against Plaintiffs and Plaintiffs were eventually forced, as a direct result of GMAC's gross and willful misconduct, to declare bankruptcy.

23. Plaintiffs contacted Office of RESPA on two separate occasions (letters dated November 18, 2004 and June 26, 2006) seeking help with their active disputes with GMAC. The Office of RESPA forwarded the complaint to GMAC, who responded by letter dated September 6, 2006, sending copies of GMAC's previous responses to the Attorney General's Office asserting said letters as their official response. GMAC has made no effort to resolve the Plaintiffs' disputes, though the Plaintiffs have continually sought resolution to their disputes, often filing complaints with governmental agencies; only to have GMAC continue to deny knowledge of the improper handling of Plaintiffs' account. [Exhibit 29]

24. As a result of the Company's inability and unwillingness to communicate with Plaintiffs and resolve problems caused by GMAC, Plaintiffs have no redress.

## GMAC Misled the Colorado State Attorney General's Office

25. Mrs. Toney subsequently delivered her complaint letter to the Attorney General's Office. The Attorney General forwarded Plaintiffs' complaint to GMAC, including copies of all Qualified Written Requests. GMAC subsequently sent written correspondence to the Attorney General claiming that it had "no record of any inappropriate conduct occurring with respect to the handling of this account." GMAC resorted to grasping at straws to reconstruct its version of the history on Plaintiffs' account. GMAC avoided direct questions by the Attorney General, prompting the Attorney General to send subsequent follow-up letters for additional information. GMAC denied receipt of any of Plaintiffs' Qualified Written Requests, knowledge of written and verbal disputes on the account, and used a smoke and mirrors tactic to cover up its improper business practices, up to and including, the illegal foreclosure procedure initiated on this account. This is directly contradicted not only by Mr. Scollin's statement that it took him nearly an hour to read all of the Qualified Written Requests, but the direct evidence of the Company's receipt of the dispute letters through Certified Mail receipts and FedEx delivery confirmation, and the May 7, 2004 letter which GMAC sent to Plaintiffs saying that it was investigating and would respond. [Exhibit 30]

26. The Colorado Attorney General's Office also requested three times that GMAC provide it with a copy of the "Right to Cure" (pursuant to the acceleration clause in Plaintiffs' Deed of Trust) which GMAC supposedly sent to Plaintiffs. Only after

the third request did GMAC provide the Attorney General's Office its response—and the

"Right to Cure" which GMAC claimed it sent to Plaintiffs was in fact the Public Trustee's

Notice of Right to Cure (which GMAC never sent to Plaintiffs); and which also failed to

notify Plaintiffs of important information and deadlines for a response in advance of

acceleration and sale of their home through the foreclosure process.  GMAC improperly

tried to pass off the Public Trustee's document, as that of its own required Notice, to the

Attorney General.


### Ongoing Misconduct of GMAC and Further Damages to Plaintiffs


27.   Plaintiffs were never notified by GMAC in writing that there was

negative information, including but not limited to, a $48,594 Charge Off on their

mortgage loan, reported to credit reporting agencies.  GMAC never accurately reported

the disputed status of Plaintiffs' mortgage account to any of the credit reporting

agencies.


28.   Despite the fact that Plaintiffs have continuously availed themselves

to GMAC, seeking a resolution to their ongoing disputes on their account; GMAC

continues with its pattern of blatantly disregarding Plaintiffs' complaints regarding the

servicing of their loan.

29. As a result of the Company's improper initiation of default and foreclosure proceedings, and the subsequent effect on Plaintiffs' credit, Plaintiffs were forced to file for bankruptcy protection to prevent the improper foreclosure and the loss of their home.

30. As a direct result of the Company's wrongful and illegal actions, Plaintiffs have suffered and will continue to suffer damages in the future. The Company's conduct has destroyed Plaintiffs' 19 year, favorable credit history, resulting in most of their creditors canceling their credit cards and/or putting them on default interest rates (some as much as 27.99%) prior to filing for bankruptcy. Plaintiffs were encouraged by Mr. Scollin to refinance their loan with GMAC because "…we don't deserve another penny of your money", but have not been able to refinance due first, to the unlawful Charge Off on Mr. Toney's credit report and now, because of the recent bankruptcy.

31. GMAC breached and continues to breach its contract with Plaintiffs and violated numerous other laws by charging fees that were not authorized by the loan agreement, by failing to timely respond, or respond at all, to the many Qualified Written Requests and by reporting and/or verifying disputed amounts to credit reporting agencies.

32. Unfortunately, the Company's illegal and improper actions not only seriously affected Plaintiffs' lives both financially and emotionally, but their children's lives as well. Not only was the entire family forced to endure the embarrassment of the wrongful foreclosure at the hands of GMAC, but because Plaintiffs' credit was destroyed, they could not, and still cannot, co-sign for their daughters' student loans, forcing two of their daughters to work more than they would otherwise have to work in order to pay for their college tuition. Plaintiffs could not, and still cannot, co-sign for a car loan for either of their two eldest daughters, and could not afford to fix Mr. Toney's car, forcing Mrs. Toney to shuttle her husband and daughter to and from work and college every single day. Mr. Toney subsequently was forced to donate his car, and by relying on public transportation, has suffered loss of self-employed income due to lack of reliable transportation. Plaintiffs' quality of life has been changed drastically due to the illegal foreclosure and wrongful credit reporting, which led to the bankruptcy.

33. As a result of the financial strain imposed on Plaintiffs by GMAC's conduct, Plaintiffs fell behind on other payments, as well, including: tuition for their daughters' college education, orthodontic bills, dental bills, credit cards, utilities (Plaintiffs lived without food in the house just to keep the power and water turned on). Most distressing of all, Plaintiffs were, and still are, unable to qualify for medically necessary equipment for the family, including a $7,000 treatment system for their five year old daughter's skin condition.

34. Because of the Charge Off on Plaintiffs' joint credit account, they were unable to refinance despite their best efforts. On November 5, 2003, Plaintiffs were offered a loan in the amount of $180,000.00, at an interest rate of 4.018%, to refinance their first and second mortgages; but were ultimately denied it due to the Charge Off by GMAC on their credit report. After working extensively with a mortgage broker, they were told that he couldn't even get them "hard money" because of the Charge Off on a mortgage loan on their credit report. Now with a bankruptcy in their credit history, Plaintiffs will never be able to qualify for such a rate.

35. In September 2004, Plaintiffs, in a desperate attempt to avoid bankruptcy and extricate themselves from GMAC clutches, tried to sell their home and intended to use the proceeds, after paying off their first and second mortgages, to pay off creditors. When the house failed to sell, they were left with only one option; bankruptcy. GMAC still has a $50,000 lien on Plaintiffs' home, preventing them from selling the home without paying GMAC first.

36. Because of the huge financial strain, Plaintiffs were unable to continue to finance Mr. Toney's self-employed business; and his subsequent lack of transportation resulted in his inability to continue with voice-over jobs, thus pushing Plaintiffs further into financial turmoil by causing a loss of income of approximately $30,000 each year for both 2004 and 2005.

37. Further, and as a regular reminder of GMAC's misconduct, Mr. Toney's paychecks are $140 less per month as a result of the repayment of the withdrawal from him 401k fund, which Plaintiffs were forced to make to keep their home out of foreclosure, thus continuing to place further financial pressure on the Plaintiffs and their family.

38. Plaintiffs and their family have also suffered additional severe emotional distress as a result Defendant's improper conduct. For example, Mrs. Toney has suffered sleep deprivation, to the severe detriment of her health. She has also been in counseling for over a year, trying to deal with the undue amount of stress the illegal foreclosure and subsequent financial burdens have caused her and her family. Unable to deal with the high level of stress in the home, one of the Toneys' daughters has been in counseling, as well.

39. In order to try to stave off bankruptcy, while trying to sell their house to pay off their debts, Plaintiffs' realtors advised them to put much of their personal belongings in a portable storage unit, at a cost of $140 dollars per month. Unsure of what was going to happen to them and their home, Plaintiffs had their personal belongings in this portable storage unit for 16 months at an approximate cost of $2,240, plus substantial inconvenience to Plaintiffs.

40.  Though Plaintiffs dispute how their account was put in default status by GMAC, it was the events beginning in late September, 2003, including but not limited to the illegal foreclosure proceedings and Charge Off reporting on their credit reports, that led to their financial demise.  Plaintiffs, by their Deed of Trust, were entitled to a written Notice of Default and a 20-Day Right to Cure before _any_ legal foreclosure action could be commenced by GMAC.  There were only eight (8) days that passed from the time that Plaintiffs were _verbally_ informed of their account being in default (September 22, 2003) until the default was cured with the $3,800 Cashier's Check sent to Sam Howell's attention (September 30, 2003) ; yet GMAC actively began all illegal foreclosure proceedings _after_ that time.  GMAC, at any time, could have prevented all of the events that ensued, but opted instead to sweep the Plaintiffs, and their disputed account, under the rug; leaving Plaintiffs to solely mitigate any and all financial damage for an additional 15 months, until they subsequently filed for bankruptcy protection.


41.  On the few occasions that GMAC has ever responded to Plaintiffs' ongoing disputes, it was only during such time that Plaintiffs had an open dispute filed with a governmental agency.  Plaintiffs have written many letters to GMAC with proof of delivery, yet GMAC still continues with their pattern of non-responsiveness; holding a lien against Plaintiffs' home, yet disregarding their own legal and contractual responsibilities.

## TOLLING OF STATUTES OF LIMITATIONS

## BY FRAUDULENT CONCEALMENT

42. Any applicable statutes of limitations have been tolled by GMAC's continuing, knowing and active concealment of the facts alleged herein. To the extent any exist, Defendants should be estopped from relying on any statutes of limitations. GMAC has been under a continuing duty to disclose the true character, nature and quality of its financial services. GMAC owed Plaintiffs an affirmative duty of full disclosure, but knowingly failed to honor and discharge such duty.

## FIRST CLAIM FOR RELIEF

(For Violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §2605)

43. Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set herein.

44. Under 12 U.S.C. § 2605(e) (as well as in the Deed of Trust), if a consumer sends a Qualified Written Request to the consumer's loan servicer, the servicer must provide a written acknowledgment within 20 business days of receipt of he request. 12 U.S.C. § 2605(e)(1). The servicer must make any appropriate

corrections to the account and must provide the consumer with a written clarification regarding the dispute no later than 60 business days after receiving the request. 12 U.S.C. § 2605(e)(2). During this 60 day period, the servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or Qualified Written Request. 12 U.S.C. § 2605(e)(3).

45. The "Disclosure Statement" provided to the Plaintiffs with the mortgage documents and executed by both Plaintiffs and the mortgage lender, also provides the following concerning "Complaint Resolution":

Section 6 of RESPA (12 U.S.C. § 2605) gives you certain consumer rights, whether or not your loan servicing is transferred . If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgment within 20 business days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. No later that 60 business days after receiving your request, your servicer must make any appropriate corrections to

your account and must provide you with a written clarifi-

cation regarding any dispute.  During this 60 day period,

your servicer may not provide information to a consumer

reporting agency concerning any overdue payment related

to such period or qualified written request.


46.  12 U.S.C. § 2605(e)(2)(A)-(C) provides, in part, that not later than 60

days after receipt of a Qualified Written Request and before taking any action with

respect to the inquiry of the borrower, the servicer shall (1) make appropriate

corrections in the account of the borrower and transmit to the borrower a written

notification of such correction, or (2) after conducting an investigation, provide the

borrower with a written explanation of clarification including a statement as to why the

servicer believes the account to be accurate, or a statement providing the information

requested by the borrower, or an explanation of why the information requested is

unavailable or cannot be obtained by the servicer.


47.  12 U.S.C. § 2605 (e)(3) provides that during the 60 day period

beginning on the date of the servicer's receipt of a Qualified Written Request, a servicer

may not provide information regarding any overdue payment to any consumer reporting

agency.

48. GMAC violated and continues to violate 12 U.S.C. § 2605 with respect to the servicing of Plaintiffs' mortgage loan by: (a) failing to acknowledge receipt of Plaintiffs' numerous Qualified Written Requests; (b) failing to respond to Plaintiffs' numerous Qualified Written Requests; (c) running Plaintiffs' account delinquent as to the disputed amounts; and (d) improperly reporting Plaintiffs' account delinquent to consumer credit reporting agencies.

49. As a result of Defendant GMAC's wrongful conduct, Plaintiffs have suffered damages.

50. Plaintiffs are entitled to a judgment in their favor and against GMAC for their actual damages in an amount to be determined at trial, plus statutory damages and costs.

## SECOND CLAIM FOR RELIEF

(For Violations of the Fair Credit Report Act 15 U.S.C. §1681 et seq.)

51. Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

52. 15 U.S.C § 1681s-2 (a)(1)(A) prohibits a furnisher of information from reporting information with actual knowledge of errors. Throughout the time that

Plaintiffs were disputing their account via written Qualified Written Requests, GMAC continued to report their account (including all disputed amounts) as delinquent to all credit reporting agencies.

53. 15 U.S.C. § 1681s-2(a)(1)(B)(i)(ii) prevents the furnisher of information from reporting information after notice and confirmation of errors if the person has been notified by the consumer that the specific information is inaccurate; and if the information is, in fact, inaccurate. Through the many communications, both written (Qualified Written Requests) and verbal (conversations with Mrs. Givison, Mr. Scollin, Mr. Carravetta and Nick), Plaintiffs continually informed GMAC of their disputes. GMAC willfully disregarded those disputes and continued reporting the account as delinquent. GMAC sent Plaintiffs a written confirmation of removal of the Charge Off, yet verified it later to one of the credit reporting agencies.

54. 15 U.S.C. § 1681s-2(a)(2)(A)(B) specifies the duty of the furnisher of information (GMAC) to promptly notify the consumer reporting agency of the determination that there was inaccurate information reported on the account, and to provide the agency with any corrections or additional information that is necessary to make the information provided by the person (GMAC) to the agency complete and accurate. It further prevents the person (GMAC) from furnishing to the agency any of the information that remains not complete or accurate. GMAC had specific knowledge that the Charge Off and delinquent status of the Plaintiffs' mortgage account was being

reported inaccurately to the credit reporting agencies; and after telling Plaintiffs that it would remove the information, it later verified the erroneous information to at least one agency, keeping the Charge Off on Plaintiff's report for over 9 months.

55.  15 U.S.C. § 1681s-2(a)(3) specifies the duty to provide notice of dispute; stating that if the completeness or accuracy of any information is disputed to the furnisher of information (GMAC) by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.  Throughout the entire time that Plaintiffs were disputing the wrongful actions on their account with GMAC, via Qualified Written Requests and verbally to GMAC employees, GMAC continued to report delinquent account information, up to and including the Charge Off, without ever furnishing the information to the credit reporting agencies that Plaintiffs were disputing their account.

56.  As a result of Defendant's, wrongful conduct, Plaintiffs have suffered actual damages.

57.  Plaintiffs are entitled to a judgment in their favor and against GMAC, for their actual damages in an amount to be determined at trial plus statutory damages and costs.

## THIRD CLAIM FOR RELIEF

(For Breach of Contract)

58. Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

59. Plaintiffs' mortgage loan, owned and serviced by GMAC Mortgage Corporation, has contractual provisions outlining the payment terms, including a monthly due date and a subsequent grace period of time during which Plaintiffs may make payments without incurring late fees and before any late fees may be assessed.

60. The agreement further provides that if a customer sends a Qualified Written Request to the servicer concerning the servicing of the loan, the servicer must provide the customer with a written acknowledgment within 20 business days of receipt of the Request. Additionally, no more than 60 business days after receiving the Request, the servicer must make any appropriate corrections to the account and must provide written clarification regarding any dispute.

61. The loan agreement also states that during this 60 day period, the servicer may not provide information to a consumer reporting agency concerning any overdue payment related such period or Qualified Written Request.

62. GMAC assumed the obligations of the loan agreement when it took over and assumed the servicing of Plaintiffs' loan from Genisys Financial Corp.

63. Plaintiffs satisfied their obligations by making timely payments of principal and interest on their loans and notifying GMAC via Qualified Written Requests when disputes arose.

64. GMAC breached its contract with Plaintiffs by charging fees that were not authorized by the loan agreement, by failing to acknowledge receipt of, and respond to, Plaintiffs' written disputes on the account, by failing to send written Notice of Default and provide Plaintiffs with a 20 Day Right to Cure, and by failing to notify their attorneys (Castle, Meinhold & Stawiarski, LLC) that an excess of the amount demanded by GMAC was paid to GMAC by certified funds before any legal action was filed with the Public Trustee's office.

65. GMAC has engaged in conduct whereby it intentionally or recklessly failed to promptly and accurately process and post payments received, by recognizing the timely-received payments only after the passage of the monthly due date or the grace period, so as to assess late fees.

66. Because GMAC inaccurately maintains Plaintiffs' account so as to assess improper and unwarranted fees, the Company's records of Plaintiffs' payments

and account status are inaccurate. GMAC has refused to desist in its unfair and deceptive acts and correct the problems, even when Plaintiffs have repeatedly brought the problems to the Company's attention.

67.    Specifically, when Plaintiffs attempted in good faith to inquire about the unwarranted fees imposed and/or problems with posting of payments to their accounts, GMAC was unable or unwilling to provide prompt, proper, or accurate responses, and in most instances, any response at all.

68.    Further, when Plaintiffs attempted to communicate with GMAC and provide documents or evidence to the Company demonstrating improper charges and/or that proper payment was sent and received, GMAC simply ignored the documentation and/or denied receipt of documents. Despite Plaintiffs good faith attempts at reconciling their disputed account, Defendant continues with its pattern of non-responsiveness, while still holding a $50,000 lien against the property.

69.    As a result of Defendant GMAC's wrongful conduct, Plaintiffs have suffered and continue to suffer damages in an amount to be determined according to proof at time of trial.

## FOURTH CLAIM FOR RELIEF

(For Unjust Enrichment)

70.  Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

71.  By its wrongful acts and omission, Defendant GMAC was unjustly enriched at the expense of Plaintiffs and should be required to disgorge such profits and to make restitution to Plaintiffs and be enjoined from continuing its deceptive acts and practices.

72.  GMAC still holds a $50,000 lien on Plaintiffs' home and has refused to resolve the disputes on their account or to communicate with them at all.  GMAC will be unjustly enriched if Plaintiffs sell their home, because it has ignored all of Plaintiffs' attempts at resolution and settlement of the disputes, continuing with its pattern of non-responsiveness, and letting interest accrue on an account that would have to paid in full if Plaintiffs were to sell their home.

73.  By reason of the foregoing, Plaintiffs seek restitution from Defendant GMAC, and disgorgement of all profits and benefits obtained or received by GMAC as a result of its wrongful conduct.

## **FIFTH CLAIM FOR RELIEF**

(For the Breach of the Covenant of Good Faith and Fair Dealing)

74. Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

75. The contract between Plaintiffs and GMAC Mortgage, Inc., included a duty of good faith and fair dealing by GMAC to Plaintiffs. As an implied covenant in the contract, GMAC had a duty not to commit acts which would improperly deprive Plaintiffs of the benefit of the contract and had a duty to do everything that the contract presupposes each of the parties would do to accomplish the purpose or purposes of the contract.

76. As described herein, GMAC Mortgage acted in breach of the implied covenant of good faith and fair dealing, and its duties thereunder.

77. As a result of GMAC's wrongful conduct, Plaintiffs have suffered and continue to suffer economic losses and other general and specific damages, in an amount to be determined by the Court at the time of trial.

## SIXTH CLAIM FOR RELIEF

(For Declaratory and Injunctive Relief)

78.  Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set herein.

79.  On each cause of action stated above, Plaintiffs have been and will continue to be irreparably injured in the future by Defendants' misconduct.

80.  Plaintiffs seek a judgment declaring that Defendant GMAC must cease the activities described herein and provide for adequate procedures and policies for the immediate and complete refund of illegal and unwarranted late and other fees, as well as the proper acknowledgment and handling of Qualified Written Requests and proper application of payments received.

81.  Plaintiffs do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of both Defendants' misconduct unless injunctive and declaratory relief is granted.

82.  By reason of the foregoing, Plaintiffs have no adequate remedy at law and are entitled to declaratory and injunctive relief as set forth above.

WHEREFORE, Plaintiffs request judgment and relief as follows:

1.  On the First Claim for Relief:  Judgment in favor of Plaintiffs and against GMAC in the amount of the actual damages suffered by Plaintiffs, plus statutory damages and costs.

2.  On the Second Claim for Relief:  Judgment in favor of Plaintiffs and against GMAC, in the amount of the actual damages suffered by Plaintiffs, plus statutory damages and costs.

3.  On the Third Claim for Relief:  Restitution in an amount to be determined by the Court at the time of trial.

4.  On the Fourth Claim for Relief:  Restitution in an amount to be determined by the Court at the time of trial.

5.  On the Fifth Claim for Relief:  Declaratory and preliminary and permanent injunctive relief against Defendant GMAC.

6.  On the Sixth Claim for Relief: Declaratory and preliminary and permanent injunctive relief against Defendant GMAC; in the form of an injunction

against GMAC preventing GMAC from asserting its rights as a lien holder on Plaintiffs'

home, until such time as the matter comes before the Court.

7. All costs and expenses, including the costs of experts; and all such

other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

Dated: September 25, 2006

Respectfully submitted,

s/John M. Toney

s/Valerie Toney

Plaintiffs, Pro Se

7126 S. Birch Way

Centennial CO 80122

303-773-8332